*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* L. L. GENTRY, Minor.

FOR PUBLICATION
March 18, 2026
1:42 PM

No. 376583
Macomb Circuit Court
Family Division
LC No. 2025-000042-NA

Before: MALDONADO, P.J., and M. J. KELLY and TREBILCOCK, JJ.

M. J. KELLY, J.

Respondent appeals as of right the trial court order terminating his parental rights to his minor child, LG, under MCL 712A.19b(3)(h), (j), and (k). On appeal, respondent challenges only the court's finding that it was in LG's best interests to terminate his parental rights. Because we conclude that the court's best-interests determination was not clearly erroneous, we affirm.

## I. BASIC FACTS

In October 2023, the Department of Health and Human Services requested the court to authorize a petition it had filed, take jurisdiction over LG, and terminate respondent's parental rights. The allegations against respondent included that he had been arrested for child pornography. Almost two years later, the petition was dismissed due to the unavailability of petitioner's witnesses. After the dismissal, LG's mother began to allow LG to speak with respondent over the phone. Thereafter, petitioner filed a second petition, again seeking termination of respondent's parental rights. The court authorized the new petition, denied respondent's request to be allowed to continue to speak to LG over the phone, and again suspended respondent's parenting time.

Respondent's mother testified that the order prohibiting phone contact between LG and respondent was "confusing" to LG and that he did not understand why he could not have contact with respondent. He was five years of age at the time and was aware only that respondent was in "jail" because he had done something "bad." Because of his tender age, LG was not told that respondent was incarcerated for sexual exploitation of a minor and that his half-siblings were

respondent's victims. Neither respondent nor LG's mother believed that LG needed therapy to help him process his separation from respondent.

At a pretrial hearing, respondent requested dismissal of the matter, arguing that he would be incarcerated in federal prison until long after LG would reach the age of majority. The court denied his request, noting that the criminal case against respondent had not yet concluded. The court also denied a request from LG's mother that respondent be allowed to have phone calls with LG. Instead, the court continued its order suspending respondent's parenting time and it ordered a psychological evaluation of LG. Notwithstanding the court order, LG's mother did not take him for a psychological evaluation.

In June 2025, respondent again sought to have the petition dismissed. His lawyer noted that respondent had pleaded guilty to sexual exploitation of a child in the federal criminal case,[1] was sentenced to 40 years of imprisonment, and that LG would be "well into his forties, probably into his fifties" when respondent would be released. He asserted that, as a result, respondent could pose no risk of harm to LG. The court denied that motion, commenting that there was always a chance that respondent could have his sentence reduced.

Subsequently, respondent entered a no contest plea to the allegations in the petition. The petition, which had been amended, served as the factual basis for the plea. The amended petition included allegations that respondent had sent a photograph of his eight-year-old daughter[2] to an undercover FBI agent, that he had captured images of his stepchildren via a hidden camera inside the bathroom of their family home, that he had been arrested in August 2023, and that he had been charged with sexual exploitation of a child and distribution of child pornography. Respondent's stepchildren are LG's half siblings. The court accepted respondent's plea, found that there were statutory grounds to exercise jurisdiction, and entered an order taking jurisdiction over LG.

Respondent stipulated that statutory grounds for termination were alleged in the petition on the basis of his criminal conviction for sexual exploitation of a child. Based upon that stipulation, the court found statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(h), (j), and (k).

The trial court then heard testimony relating to whether termination of LG's parental rights was in LG's best interests. Based upon the evidence presented, the court found that termination of respondent's parental rights was in LG's best interests, so it entered an order terminating respondent's parental rights. This appeal follows.

---

[1] As part of a plea arrangement in the federal court, two other charges were dismissed.

[2] A petition seeking termination of respondent's parental rights to his daughter was filed in another county. The court in the other county denied the petition.

## II. BEST INTERESTS

### A. STANDARD OF REVIEW

Respondent argues that the trial court clearly erred by finding that termination of his parental rights was in LG's best interests. A court's findings related to its best-interests determination are reviewed for clear error. *In re Atchley*, 341 Mich App 332, 346; 990 NW2d 685 (2022). A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake. *Id*. at 338.

### B. ANALYSIS

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance Minors*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014), citing MCL 712A.19b(5). To terminate parental rights, the trial court must determine, by a preponderance of the evidence, that termination is in the child's best interests. *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015). In making this assessment, the trial court should weigh all available evidence before it. *In re Trejo*, 462 Mich 341, 356; 612 NW2d 407 (2000).

"The focus at the best-interest stage has always been on the child, not the parent." *In re Atchley*, 341 Mich App at 346 (quotation marks and citation omitted). In evaluating a child's best interests, the court may consider many factors. *Id*. Amongst the factors the court may consider are "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability and finality." *In re Keillor*, 325 Mich App 80, 94; 923 NW2d 617 (2018). Additionally, a trial court considering termination of parental rights may—but is not required to—also consider the factors from the Child Custody Act, MCL 722.21 *et seq*. *In re Medina*, 317 Mich App 219, 238 & n 8; 894 NW2d 653 (2016).

On appeal, respondent argues that the trial court clearly erred by finding that LG has a "lack of extended family support." We agree. LG's mother testified that respondent did not provide any support since his arrest in August 2023. She stated that since then she had been "paying for everything" and that she "works a lot." However, she also testified that LG's paternal grandfather had helped her with the mortgage payments on respondent's house before it was sold, that he had helped her "buy" a new house, and was providing financial assistance for her vehicle. In turn, respondent testified that his father was using his inheritance money and money from the sale of his house to provide financial assistance to LG's mother. He added that LG spent time with his parental grandfather. LG's mother stated that the contact occurred approximately once per month. In light of this testimony, we are left with a definite and firm conviction that the trial court clearly erred by finding that there was no extended family support.

That factual error does not, however, render the trial court's entire best-interests decision clearly erroneous. Respondent focuses on the bond between himself and LG. He maintains that LG is not "traumatized" by phone contact with him, and that LG wants to have contact with him. The record reflects that respondent was arrested in August 2023, when LG was three years old. He had no contact with LG until the initial petition was dismissed. Thereafter, he had phone contact with LG for a four or five week period. LG's mother testified that the visits were once or

twice per week. Respondent and LG's mother both testified that LG asks to speak with respondent and that he was upset when he was told he could not continue the contact. Given this, there was certainly testimony that supported the existence of a bond between respondent and LG. Nevertheless, the fact that there is a bond between a parent and a child is not dispositive of the child's best interests. Rather, it is only one factor that a trial court may consider when evaluating a child's best interests. See *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014) (holding that reversal was not warranted based upon the existence of a "strong bond" between a respondent and child because the bond's existence was "only one factor among many" that had been considered).

Likewise, the fact that "[p]lacement with a relative weighs against termination" is not dispositive because a "trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests." *In re Atchely*, 341 Mich App at 347 (quotation marks and citation omitted). Unlike the existence of the bond between a parent and a child, which is merely a factor that the court may consider, see *In re White*, 303 Mich App at 714, "the fact that [a child is] in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination" is in the child's best interests," *In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012). "A trial court's failure to explicitly address whether termination is appropriate in light of the [child's] placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal." *Id*.

Respondent argues that reversal is required because the trial court failed to consider that LG was safe and stable in his mother's care. LG's mother is a relative, see *In re Boshell/Shelton*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371973); slip op at 10,[3] so the court was required to explicitly consider his placement with her when making its best-interests determination. We agree that the trial court was required to explicitly consider LG's relative placement, but disagree that the trial court failed to do so.

While a trial court must "explicitly address" a child's relative placement, *In re Olive/Metts*, 297 Mich App at 43, its underlying reasoning need not be so specific. "Brief, definite, and pertinent findings and conclusions on contested matters are sufficient." MCR 3.977(I)(1).

---

[3] The *Boshell/Shelton* Court explained:

> In the past, a child's biological parent was not recognized in the definition of "relative." *In re Schadler*, 315 Mich App 406, 413; 890 NW2d 676 (2016). However, MCL 712A.13a was amended by 2022 PA 200, effective October 7, 2022, and now defines a "relative" as any adult "[r]elated to the child within the fifth degree by blood, marriage, or adoption . . . ." MCL 712A.13a(1)(j)(*i*). The statute does not define the new phrase "within the fifth degree by blood," but a different chapter of the Probate Code of 1939, the Michigan Adoption Code, defines that particular phrase to include a parent. MCL 710.22(y). Therefore, we conclude that "relative" under MCL 712A.13a(1)(j) now includes a biological parent. [*In re Boshell/Shelton*, ___ Mich App at ___; slip op at 10.]

Additionally, a trial court's findings are generally sufficient if "it appears that the trial court was aware of the issues in the case and correctly applied the law, and where appellate review would not be facilitated by requiring further explanation." *Ford Motor Co v Dep't of Treasury*, 313 Mich App 572, 589; 884 NW2d 587 (2015) (quotation marks and citation omitted). Here, the trial court repeatedly recognized that LG was placed with his mother. It found that LG had "lived continuously with his mother and siblings since his birth, that the permanency plan was for LG to continue in his mother's custody, that he had "remained in the same home," that it was essential to continue his placement "in the only environment" that he had thrived in, that his "household" was providing him with a "protective environment free from exploitation." In addition to explicitly considering—at length—LG's placement with his mother, the court also explicitly found that termination of respondent's parental rights was in LG's best interests. In light of this record, we conclude that the court's findings were adequate to facilitate appellate review. Moreover, our review of the issue would not be facilitated by a more detailed statement by the trial court indicating that it had considered LG's placement with his mother as a relative placement when it found that termination of respondent's parental rights was in LG's best interests.

Respondent next contends that the trial court clearly erred because it did not properly consider his parenting ability when it found that termination of his parental rights was in LG's best interests. We disagree. The trial court found that respondent was not morally fit as a parent. In doing so, the court remarked, "[a] parent who has committed a sexual offense against a minor in his own family demonstrates [a] profound breach of trust and safety." The court found that respondent's "conduct is fundamentally at odds with the responsibility of parenthood." Respondent's conviction for sexual exploitation of a minor involved the sexual exploitation of LG's half-sister. Additional sexual abuse was perpetrated against three of LG's half-brothers, who were living in the same household as LG. Respondent testified that prior to his arrest he had a "good relationship" with LG's half-brothers. And, despite his abuse of all of LG's half-siblings, respondent testified that his contact with LG prior to his arrest was "great." LG's mother described him as a "great" father to LG. Respondent even went so far as to testify that, although he made "poor decisions," he had never placed his own needs above those of LG. The "poor decisions" that he referred to are undisputedly his repeated decisions to sexually exploit all four of LG's half-siblings and to transmit "child pornography" to an undercover federal agent. Considering the nature and extent of respondent's sexual exploitation of LG's siblings, the trial court did not clearly err by finding respondent's parenting ability was lacking.

Respondent nevertheless argues that a court "must" look at a parent's ability to "benefit" from a service plan. In support of that assertion, he directs this Court to *In re White*, 303 Mich App at 713. That case, however, does not provide that a court is mandated to consider a parent's ability to benefit from a service plan; it only states that a court "may consider" a "parent's compliance with his or her case service plan." *Id*. at 714. Here, respondent testified that he was willing to participate in a parent-agency agreement (PAA). He further directs this Court to testimony that LG's mother was willing to cooperate with petitioner to ensure that LG's home remained appropriate. The caseworker further confirmed that some services might be available to respondent even though he is incarcerated. She explained further that there was no chance of reunification in this case because of the length of respondent's incarceration. She added that the nature and extent of the services that could be provided was unknown. In its findings, the court noted that respondent's "40-year sentence extending well beyond [LG's] 18th birthday renders

-5-

any realistic plan for reunification impossible." The court found that "[t]ermination crystalizes a stable and lifelong home for [LG] without the looming uncertainty of Respondent's eventual release decades from now." In light of the foregoing, the mere fact that respondent was willing to participate in services does not render the trial court's best-interest findings clearly erroneous.

Next, respondent argues that the trial court clearly erred by finding termination of his parental rights to be in LG's best interests because LG was "safe and stable" with his mother. He contends that the trial court did not address that aspect of the case. As stated above, however, the court considered LG's placement with his mother, so there is no error in that regard. Further, respondent's argument appears to be that LG is "safe" because his incarceration means that he is not in a position to sexually exploit LG. But the court recognized that there are many harms that can arise from contact with a parent who has sexually abused his children. That includes emotional trauma. The court found that it had to

> safeguard [LG's] safety from trauma and harm. Respondent's federal conviction under the aforementioned federal statute involved the sexual exploitation of one of [LG's] half siblings. The proximity of that crime within the same household heightens the risk of emotional injury to [LG] should any contact be resumed. By terminating Respondent's rights[,] the Court ensures that [LG] will no longer live under the shadow of that trauma, or face the possibility of re-traumatization through . . . interactions.

Further, the court found:

> [LG's] mental and physical health must be supported. No evidence indicates . . . that care from Respondent, limited to sporadic institutional visits, would address [LG's] psychological needs following his half sibling's victimization. Adversely, the permanency plan under mother's custody permits timely, trauma-informed services, including a delayed psychological evaluation if needed, ensuring [LG's] emotional wellbeing.

At the time of termination, LG was only five years of age. He was unaware of the reasons why respondent was incarcerated. Testimony established, however, that he was confused and upset by the initiation and then cessation of contact with respondent. The contact was stopped because of the court order suspending his parenting time. However, there was uncertainty as to the type and frequency of contact that could be maintained in the future given respondent's federal incarceration. That uncertainty added a disruptive element of instability and uncertainty to LG's future contact with respondent. Moreover, respondent testified that, before he was sentenced, LG asked him when he would be home. He told him that it would be a "little while" and that he did not know when he was going to be home. That statement was disingenuous given that he had already pleaded guilty and, realistically, had to be aware that it would be a considerable period of time until he would be released. Finally, the caseworker testified that continued contact with respondent, a man convicted of a sexual crime against his own child, could be harmful to LG. In doing so, she stressed the potential for confusion, broken promises, letting LG down, and feeding him something that was "unreal." Given that there was already testimony that LG was confused and was being told disingenuous things such as respondent was coming home "in a little while,"

that testimony was not wholly speculative. The court's findings that LG needed to be protected from emotional harm, therefore, is not clearly erroneous.

Respondent next suggests that confusion could arise because his parental rights to his daughter were not terminated. The fact that a petition to terminate was dismissed in a different case is, however, irrelevant to a determination of LG's best interests. Indeed, the trial court must generally consider a child's best interests individually. *In re Olive/Metts*, 297 Mich App at 42.

Finally, respondent argues that the trial court incorrectly emphasized that termination of his parental rights would lead to permanency, stability, and safety for LG. We disagree. LG was five years old at the time of termination. Respondent had been arrested when he was three years old and his parenting time was suspended. The trial court found:

> [A] child's capacity to flourish depends on reliability of provisions of food, clothing, medical care and educational support. [LG] has remained in the same home, maintained the same pediatric and dental providers and is set to begin kindergarten on schedule. Any uncertainty about his permanent placement left unresolved so long as Respondent's rights continue on indefinite suspension risks interrupting his schooling and medical continuity. Finalizing a permanent custodial plan now ensures [LG's] material and educational stability.

The court also found:

> [P]ermanency and predictability are crucial for healthy child development. Under stability of environment and . . . of custodial home factors [LG] has lived continuously with his mother and siblings since birth. Respondent's 40-year sentence extending well beyond [LG's] 18th birthday renders any realistic plan for reunification impossible. Termination crystalizes a stable and lifelong home for [LG] without the looming uncertainty of Respondent's eventual release decades from now.
>
> * * *
>
> [T]he Court [further] considers the child's home, school and community record. [LG] is described . . . as engaging and well[-]adjusted but no special needs. Disrupting his placement and prolonging interim wardship would jeopardize his academic progress and peer relationship. Maintaining him in the only environment he's thrived in is essential.

Finally, the court found:

> [T]he factor of facilitation of parent/child relationship weighs against retention of rights when ongoing contact poses risk to the child, both psychologically, and if the father ever got out while [sic] [LG] is of age of majority, physically. Supervised calls ceased upon [petitioner's] advice that inconsistent, remote interaction was confusing to [LG]. Respondent's prison facility does not permit routine access,

making any future relationship sporadic, sporadic and unsupervised, further supporting termination if [sic] favor of a clear, protective plan.

Having reviewed the entire record, we do not find the court's findings clearly erroneous. The testimony established that LG was thriving in his mother's care, that he was getting ready to start kindergarten, that he was confused by the inconsistent phone contact with respondent, that the consistency of future contact was not guaranteed, that respondent posed a psychological risk to LG given his conviction for sexually exploiting LG's half-siblings, that LG had only ever known one home, and that respondent's 40-year incarceration would preclude any reunification until long after LG reaches 18 years of age.

Based upon the foregoing, we conclude that the trial court's finding that it was in LG's best interests to terminate respondent's parental rights was not clearly erroneous.

Affirmed.

/s/ Michael J. Kelly
/s/ Christopher M. Trebilcock